In Mandamus. On April 13,1891, the governor, auditor and secretary of state, acting under the power conferred on them as a board by the 11th section of the 11th article of the constitution, proceeded to and did make an apportionment, for members of the general assembly of the state, for the decennial period commencing 1891. It is claimed that in making the senatorial apportionment the provisions of the constitution have been disregarded, and that the board should, by order of this court, be compelled to make a new one.
It is evident that in exercising the jurisdiction here invoked, this court cannot, as a court of appeal, review what has been done by the board in making a senatorial apportionment of the state. No such power is conferred upon this, *436 or any other court of the state by the constitution, over the officers designated by it to make the apportionment in question ; and if it were, it could not be exercised in a proceeding in mandamus, the purpose of which jurisdiction is to compel a board or tribunal to exercise its powers or jurisdiction, not to control its discretion or supervise its proceedings. Such jurisdiction is appellate, and can only be exercised, when conferred, in a proper proceeding for that purpose. In treating the subject of jurisdiction in mandamus, Mr. High, in his work on Extraordinary Legal Remedies, § 24, says, “Stated in general terms, the principle is that mandamus will lie to compel the performance of duties purely ministerial in their nature, and so clear and specific that no element of discretion is left in their performance, but that as to all acts or duties necessarily calling for the exercise of judgment and discretion, on the part of the officer or body at whose hands their performance is required, mandamus will not lie. The application of the rule is universal, and its illustrations are as multiform as are applications for the aid of this extraordinary remedy. It applies with special force to cases where the aid of mandamus is sought against inferior courts or judges, public officers, municipal authorities and corporate officers generally, and in all these cases it is the determining principle in guiding the courts to a correct conclusion. And,” he continues, “whenever such officers or bodies are vested with discretionary power as to the performance of any duty required at their hands, or where in reaching a given result of official action they are necessarily obliged to use some degree of judgment and discretion, while mandamus will lie to set them in motion and to compel action upon the matters in controversy, it will in no- manner interfere with the exercise of such discretion, nor control or dictate the judgment or decision which shall be reached.” See also, Moses on Mandamus, 15, and Bx parte Blade, 1 Ohio St. 30, 37.
Hence it is not sufficient in this proceeding that we might be of the opinion that we could make a better apportionment than has been made by the board: To authorize this court *437 to interfere and command the board to make another apportionment, the apportionment made must so far violate the rules prescribed by the constitution, as to enable us to say, that what has been done is no apportionment at all, and should be wholly disregarded. If by any fair construction of the principles prescribed by the constitution for making an apportionment, the one made may be sustained, then it cannot be disregarded and a new one ordered.
The subject is provided for by the eleventh article of the constitution entitled, “Apportionment.” The first section provides that the apportionment of the state for members of the general assembly shall be made every ten years after the year 1851, as provided in that article. The first five sections make provision, in terms, for the apportionment of representatives among the counties of the state in the house of representatives. The sixth to the ninth, inclusive, relate exclusiveiy to the method of senatorial apportionment. The tenth contains this provision, “ and no change shall ever be made in the principles of representation, as herein established, or, in the senatorial districts, except as above established.” By the sixth section the method of ascertaining the ratio for a senator at any subsequent apportionment is prescribed; that is to say, it is to be “ ascertained by dividing the whole population of the state by the number thirty-five.” By the seventh, the counties of the state are divided into thirty-three senatorial districts, the county of Hamilton being one. The other two sections are as follows:
“ Section 8. The same rule shall be applied, in apportioning the fractions of senatorial districts, and in annexing districts, which may hereafter have less than three fourths of a senatorial ratio, as are applied to representative districts.”
“ Section 9. Any county forming part of a senatorial district, having acquired a population equal to a full senatorial ratio, shall be made a separate senatorial district, at any regular decennial apportionment, if a full senatorial ratio shall be left in the district from which it shall be taken.”
Now it is not disputed but that the third and fifth sections, which, by their terms, apply only to representative appor *438 tionment, apply also, by the reference contained in the eighth section, to senatorial apportionment; so that, in apportioning fractions and in annexing districts which may have less than three fourths of a ratio, the same rules are to be ajiplied as are applied by these sections respectively to representative districts. That is to say, by the third section, when any senatorial district shall have a fraction above the ratio so large, that being multiplied by five, the result would be equal to one or more senatorial ratios, additional senators shall be apportioned for such ratios, among the several sessions of the decennial period, as is done in the case of representative districts; And by section five, if, in fixing any subsequent senatorial ratio, a district, previously entitled to separate senatorial representation, shall have less than the number required by the new ratio for a senator, such district shall be attached to the district adjoining it, having the least number of inhabitants ; and the senatorial representation of the district so formed, must then be determined as therein provided. But it is also claimed by the defendants, that, by the reference contained in section 8, the provisions of section four are also made applicable to senatorial apportionment as well as sections three and five. This is controverted by the relator. This section would, on the claim of the defendants, mutatis mutandis, read as follows: Any district, forming with another distinct or districts, a senatorial district, during one decennial period, if it have acquired sufficient population at the next decennial period, shall be entitled to separate representation, if there be left in the district from which it shall have been separated, a population sufficient for a senator; but no such change shall be made, except at the regular decennial period for the apportionment of senators. Under the provisions of this .section so applied, it is argued that when a district is once annexed to another under the provisions of section 5, the district so formed continues to be a senatorial district through each succeeding decennial period, until a period is reached, when, by the growth of population it again attains a full senatorial ratio, and becomes, by the application of section four, again entitled to separate senatorial representation, *439 provided there is left in the district from which it is to be separated, population sufficient for a senator. In support of this view is cited the practice that has obtained with reference to the district formed in 1861, by the union of the seventeenth and twenty-eighth districts, and continued to this time, and the reason given by the several boards for continuing the annexation, which seems based on the idea that section four applies to senatorial, as well as to representative districts ; and argue that in the absence of any absolute requirement of the constitution, associations formed by such long-continued annexation, should not be broken up by separation, when neither of the constituent districts is entitled to separate representation, and either, on being separated, must be re-annexed to some other district. On the other hand it is argued that, at the end of each decennial period, the original districts, however they may have been united' by annexation, again segregate; in other words fall apart by limitation, and that it then becomes the duty of the board to make a new apportionment without any reference to the manner in which the districts were annexed prior thereto.
There is much force in the argument of the relator; but we do hot find it necessary to decide the question: For, admitting what is claimed in regard to the segregation of the original districts at the end of each decennial period, it does not follow that the apportionment made by the board should be treated as a nullity. No claim is made that, to the districts as formed, representation for fractions has not been apportioned as required by the third section. The claim is that, in the annexation of districts not having the requisite population for separate representation, according to the ascertained senatorial ratio, the requirement of the' constitution that each district' falling below the requisite fraction of this ratio, shall be annexed to the adjoining district having the least number of inhabitants, has been disregarded.
A senatorial ratio ascertained as required by the constitution, is, for the present decennial period, 104,924, so that a *440 population of 78,693, three fourths of a full ratio, is the least population a district can have and be entitled to separate representation. In consequence of the change in the relative population of the original districts, fourteen of them have lost their right to separate representation in the senate, and are each required to be attached to some other district, adjoining it, having the least population. The districts to be attached are the second, fourth, fifth, sixth, fourteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-fourth, twenty-seventh, twenty-eighth and twenty-ninth. The relator concedes that the board has properly apportioned ten of these districts by uniting them as follows : the second with the fourth, the fifth with the sixth, the twentieth with the twenty-second, the twenty-fourth with the twenty-sixth and the twenty-seventh with the twenty-ninth.
The other districts have been formed into joint districts as follows: The twenty-eighth with a population of 61,148 is attached to the seventeenth, having a population of 45,720; the eighteenth with a population of 73,321 is attached to the nineteenth, having a population of 63,461; the sixteenth with a population of 70,468 is attached to the fifteenth, having a population of 82,361; and the fourteenth with a population of 63,461 is attached to the ninth, having a population of 91,791. Now regarding the districts when once united, as forming a district, as they certainly do for the ensuing decennial period under the provisions of section five, and it will be observed by reference to a map of the state, that each of the above attached districts, has been attached by the board to the district adjoining it having the least population, as shown by the last federal census. That is to say, commencing with the twenty-eighth as the district to be attached, and it is properly attached to the seventeenth; and so, in the order named, treating the eighteenth, the sixteenth and the fourteenth as the districts to be attached, and each is found to have been attached to the proper district : For example, after the eighteenth had been attached to the nineteenth they formed a district with a population *441 of 186,782, and after the sixteenth had been attached to the fifteenth they formed a district with a population of 152,829. So that the only district adjoining the fourteenth to which it could be attached, after the formation of the above districts, was the ninth, having a population of 91,791.
But, it is claimed, that by uniting these districts as follows : The fourteenth with the nineteenth, the sixteenth with the seventeenth, and the eighteenth with the twenty-eighth, an apportionment would be attained in which the fractions over a ratio would be less, and a less number of districts, with the requisite fractional ratio for a senator, would be deprived of separate representation. Conceding this to be so, it is not such a vice in an apportionment as to make it a nullity. The constitution nowhere prescribes the order in which the districts shall be apportioned, the limit as to fractionsj nor as to separate representation based on fractional ratios. It would be a matter of some surprise had the framers of the constitution attempted to do so, as such rules could only have been based upon such foreknowledge of the future growth and distribution of the population of the state, as could not then have been possessed by any set of men. Moreover, these supposed vices are not unmixed evils: Sep-, arate representation based upon less than a full ratio, is unequal representation. It gives to a district with a population of 74,693 the same representation in the senate as a district with 104,924. Hence an apportionment, which, by annexation where annexation becomes necessary, reduces, instead of increasing, this kind of unequal representation, is subject to no objection based upon the constitution itself. On the other hand, where a district has over a full ratio, the fractions are not unrepresented; representation for the fractions is provided for in the third section. Where, however, a district has three fourths of, but less than, a ratio, full representation is allowed it, as a separate district, for the full decennial period. Here are cogent reasons why the constitution does not undertake to limit the districts to which annexations may be made by any other limitation, than that, in each case, the district shall be the adjoining one, having *442 the least number of inhabitants. The right of a district to separate representation cannot be opposed to the power of the board, in making an apportionment, to annex to it another district, when, by the terms of the constitution, its population and location permit the annexation to be made. The matter rests in the sound discretion of the board, and cannot be controlled by the courts in any form of proceeding, unless, as before stated, it so far disregards the rules prescribed by the constitution, as to enable a court to say that what it has done, is a mere nullity. If, as claimed, the duties to be performed by the board, are ministerial — a mere matter of calculation, then there is but one way in which the apportionment for a given decennial period can be made; • and one could make it as well as a dozen, if not better; and no reason is perceived why the duty should have been confided to the three principal executive officers of the state. The very fact that the governor, auditor and secretary of state are consociated as a board to apportion the state for members of the general assemby, shows of itself, that, in the judgment of the framers of the constitution, in applying the rules prescribed, a discretion would have to be exercised, and these officers were selected to exercise it. Whether the discretion conferred on the board, has been wisely or unwisely exercised in this instance, is immaterial in this proceeding. It is sufficient that they had the power under the constitution to make the apportionment as they have made it. For the wisdom, or unwisdom, of what they have done, within the limits of the powers conferred, they are answerable to the electors of the state, and no one else.
Another objection is made, though not insisted on in argument, that the board has violated the constitution in assuming to create new districts, by changing the territorial limits of the fourteenth and nineteenth districts, so as to include in each portions of the counties of Monroe and Noble. The explanation is this: The day after the constitution was adopted by the framers, containing the senatorial districts as formed by the convention, the legislature then in session under the constitution of 1802, by an act passed March 11, *443 1851, created the county of Noble, partly from the territory' of each of the following counties as they then existed, to wit: Morgan,. Guernsey, Monroe and Washington; nd also, by the second section of the same act, attached three townships of the county of Washington, situate on its north eastern border, to the county of Monroe. 49 Laws, 137. The validity of this act was sustained in State ex rel. Evans v. Dudley, 1 Ohio St. 437. The constitution as framed by the convention was afterwards adopted by the people, without any change being made in the senatorial districts established by it. So that by reason of the provision of the constitution above referred to, that no change shall be made in the senatorial districts therein formed, except as therein provided, parts of the county of Washington are in the nineteenth district, and parts of the counties of Monroe and Noble are in the fourteenth district; and this apparent anomaly in senatorial apportionment has necessarily been perpetuated to this time, and will have to be continued until the constitution can be amended.
We are therefore of the opinion that the senatorial apportionment for the general assembly of the state, made by the board at its session on the 13th day of April, 1891, is a valid apportionment, and that the writ prayed for should be refused.

Writ refused.

[The above case, together with the briefs of counsel, complete, will be published in full in the Report of the Secretary of State, for 1891. — Rep.]